UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLORADO
Honorable Howard R. Tallman

| | |
|---|---|
| **In re:** ) | |
| ) | |
| **SARA QUARLES,** ) | **Case No. 11-36436 HRT** |
| ) | **Chapter 7** |
| **Debtor.** ) | |
| ) | |
| ) | |
| **BRUCE OCKER,** ) | **Adversary No. 12-1093 HRT** |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | |
| ) | |
| **SARA QUARLES,** ) | |
| ) | |
| **Defendant.** ) | |

## ORDER ON ADVERSARY COMPLAINT

This case comes before the Court on Plaintiff's *Complaint to Determine Plaintiff's Equitable Interest in Property (11 U.S.C.§ 541(d)); Objecting to Discharge (11 U.S.C. § 727); and Objecting to Dischargeability (11 U.S.C. § 523).* After a trial held on May 21, 2013, the Court took the matter under advisement and ordered the parties to submit written closing arguments, which were timely filed. The Court is now ready to rule.

I. Background.

Before the commencement of this adversary proceeding, the Plaintiff, Bruce Ocker ("Ocker"), and the Debtor, Sara Quarles ("Debtor"), were in a relationship and at one point were engaged to be married. On October 29, 2008, Debtor purchased a house at 14295 County Road 2, Brighton, Colorado ("the Property") for $224,000, with Debtor making a down payment of $16,500. Title to the Property was in Debtor's name only, and Debtor signed the loan documents to obtain the mortgage on the home. Debtor and Ocker lived in the home with Debtor's minor daughter. At times, Ocker's daughter and Debtor's mother also lived in the home. Over the next several months, Ocker, Debtor, and some of the couple's friends and family members, participated in making improvements on the Property. In February 2009, Ocker transferred $70,500 to Debtor. This transfer was memorialized through a letter written by Debtor and signed by Ocker, which read as follows: "I, Bruce Ocker am giving to my fiancé, Sara Quarles a transfer of funds from my account to her account to refinance our house and pay off her debt (credit cards) in full. Her name is the only name on the house that is why I am giving her the money to pay down our loan." Of the $70,500, Debtor used $33,453.08 to refinance the

Property, $15,000 to "repay" her minor daughter's account,[1] and the remaining $22,046.92 to pay off her credit cards. Subsequently, Ocker, and others, continued to make improvements to the home, such as painting, carpeting, and installing fencing and landscaping. Debtor worked full-time and paid the majority of the couple's living expenses of approximately $2,400 monthly. About a year after moving into the house, Ocker, who was unemployed and collected disability, began paying Debtor $500 a month towards their expenses. The relationship continued until approximately June 2011, when Ocker moved out of the Property.

Shortly thereafter, Ocker sued Debtor in state court, asserting claims based on common law marriage and breach of implied contract.[2] Debtor filed for Chapter 7 bankruptcy on November 10, 2011. The lawsuit was listed in paragraph 4 of Debtor's statement of financial affairs as a civil action that was "pending," and Debtor scheduled Ocker's claim as unsecured and disputed in the amount of $73,639. Ocker initiated this adversary proceeding on February 7, 2012.

II. Discussion.

    A. Objections to Discharge Under 11 U.S.C. § 727.

Ocker has brought three objections to the Debtor's discharge under 11 U.S.C. § 727(a)(2)(A), § 727(a)(4)(A), and § 727(a)(3). The objections relate to a transaction involving Debtor's pre-petition vehicle purchase and the use of her minor daughter's bank account.

        1. § 727(a)(2)(A) Objection.

For § 727(a)(2)(A) to effectively bar a discharge, four elements must be present: (1) the actual transfer of property, (2) the debtor owned the transferred property, (3) the transfer occurred within one year of filing the bankruptcy petition, and (4) the debtor had the intent to defraud the creditor at the time of the transfer. *In re Seay*, 215 B.R. 780, 788-89 (B.A.P. 10th Cir. 1997). The creditor alleging that a debtor's discharge should be denied has the burden of proving each element of § 727(a)(2)(A) by a preponderance of the evidence. *Gullickson v. Brown (In re Brown)*, 108 F.3d 1290, 1293 (10th Cir.1997). In support of this claim, Ocker alleges that Debtor transferred a 2003 Dodge Neon to her brother, an insider, shortly before filing bankruptcy, with the intent to defraud creditors.

At trial, Debtor testified that on October 17, 2011, she went to Hajek Chevrolet to trade in her 2003 Dodge Neon for a 2012 Chevrolet Cruz, and received a $1,000 trade-in credit for the

---

[1] The down payment on the Property had been withdrawn from this account.

[2] There are no filings from the state court action in evidence, but Exhibit C is a letter dated July 18, 2011, from Ocker's counsel to Debtor that summarized the claims Ocker apparently was alleging against Debtor.

Neon. She testified the Neon was in poor condition, with failing brakes, and she knew she would not be able to finance a newer vehicle after her bankruptcy filing. After completing the transaction, her brother (who also testified at trial), asked her how much she received for the Neon, and told her he could make use of the car. They both went back to the dealership, and her brother bought the Neon from Hajek for $1,000. The Court found the testimony of Debtor and her brother in this regard to be credible, and their testimony is consistent with the title documents admitted as Exhibit 11.

Ocker has shown that the Debtor owned the Neon and that she transferred it within one year of filing her bankruptcy petition, satisfying the first three elements of § 727(a)(2)(A). The remaining element that must be proven, by a preponderance of the evidence, is that Debtor did so with fraudulent intent. "Actions from which fraudulent intent may be inferred include situations in which a debtor: conceals the prebankruptcy conversion of nonexempt assets to exempt assets; converts nonexempt assets to exempt assets immediately before the filing of the bankruptcy petition; gratuitously transfers property; continues to use transferred property; and transfers property to family members." *In re Carey*, 938 F.2d 1073, 1077 (10th Cir. 1991). To determine whether Debtor had fraudulent intent, courts also consider the monetary value of the asset in question. *Id.* (internal case citations omitted). "The cases, however, are peculiarly fact specific, and the activity in each situation must be viewed individually." *Id., see also Cadle Co. v. Stewart (In re Stewart)*, 263 B.R. 608, 611 (10th Cir. BAP 2001). Whether a debtor transferred his property with intent to defraud creditors is a finding of fact. *In re Seay*, 215 B.R. at 788.

At trial and in closing argument, Ocker asserted that the transfer of the Neon was a "transfer between insiders done through an intermediary." To support this argument, Ocker contends that when answering questions about the transfer, Debtor was "evasive and deceptive." For instance, when asked whether she had produced documentation to show what her brother had paid for the Neon, she responded, "Why would I have anything to produce?" After Ocker's counsel countered, "That doesn't answer my question," she responded, "No." The Court does not view this response as being evasive and deceptive. Rather, it tends to support her testimony, and her brother's testimony, that the transaction her brother made to purchase the Neon was separate from her trade-in of the vehicle.

Ocker further alleged that the "timing makes it obvious that the transfer was made with the intent to hinder, delay, or defraud a creditor." However, a transfer made in close proximity to the filing of a bankruptcy petition is not per se evidence of fraud. *Brown*, 108 F.3d at 1293; *Carey,* 938 F.2d at 1077. There was no evidence that Debtor even considered a transfer of the Neon to her brother until after she had already transferred the car to the Hajek dealership. Further, she fully disclosed the trade-in of the Neon under paragraph 10 of her statement of financial affairs, which indicates a lack of fraudulent intent. See *In re Stewart*, 263 B.R. at 617. Finally, the value of the Neon was only $1,000, which does not represent a substantial portion of Debtor's assets. After considering all the testimony and evidence in this case, the Court concludes that Ocker did not prove, by a preponderance of the evidence, that Debtor transferred the Neon with an intent to defraud creditors.

2. § 727(a)(4)(A) Objections.

11 U.S.C. § 727(a)(4)(A) provides that "[t]he court shall grant the debtor a discharge unless the debtor knowingly and fraudulently, in or in connection with a case made a false oath or account. A 'false oath' may be either: (1) a false statement or omission in the debtor's schedules, or (2) a false statement by the debtor at an examination during the course of the proceedings." *In re Garland*, 417 B.R. 805, 814 (B.A.P. 10th Cir. 2009). To deny Debtor's discharge under this section, Ocker must show by a preponderance of the evidence that: (1) the debtor made a statement under oath; (2) the statement was false; (3) the debtor knew the statement was false; (4) the debtor made the statement with fraudulent intent; and (5) the statement related materially to the bankruptcy case. *In re DiGesualdo*, 463 B.R. 503, 522 (Bankr. D. Colo. 2011).

First, Ocker alleges that Debtor made a false oath in her Statement of Financial Affairs, in paragraph 19, where she stated she had not given a financial statement to any creditor within two years prior to filing her bankruptcy petition, even though she gave financial information to Hajek Chevrolet in connection with her purchase of the Chevrolet Cruz.

Immediately above paragraph 19, the following statement appears:

> The following questions are to be completed by every debtor that is a corporation or partnership and by any individual debtor who is or has been, within six years immediately preceding the commencement of this case, any of the following: an officer, director, managing executive, or owner of more than 5 percent of the voting of equity securities of a corporation; a partner, other than a limited partner, of a partnership, a sole proprietor, or self-employed in a trade, profession, or other activity, either full- or part-time.
>
> *(An individual or joint debtor should complete this portion of the statement only if the debtor is or has been in business, as defined above, within six years immediately preceding the commencement of this case. A debtor who has not been in business within those six years should go directly to the signature page.)*

Debtor does not fall within any of the classifications listed above paragraph 19, so this paragraph is not applicable to her. Even if it applied, the Court finds no indicia of an intent to conceal the transaction. The automobile purchase was fully disclosed as it was listed in Debtor's schedules. Because the automobile transaction was disclosed, Debtor's failure to note that she signed off on a credit application, prepared by Hajek Chevrolet, is more consistent with an innocent oversight than an intention to omit information from the Debtor's schedules. The omission provides no basis for a denial of discharge under § 727(a)(4)(A).

Second, Ocker alleges Debtor made a false oath when she indicated in paragraph 14 of her Statement of Financial Affairs that she neither held nor controlled any property for another

person. Ocker claims that because Debtor holds money for her minor daughter, and that because this money was used by Debtor in her discretion for her own benefit, Debtor's failure to acknowledge this in her Statement of Financial Affairs results in a false oath. This account also was not present on any of Debtor's schedules.

As evidenced by Ocker's Exhibit 20, the money in question was in an account with the Public Service Credit Union, and both Debtor's name and her minor daughter's name appear on the account statement. Because her daughter was a minor, and only Debtor had access to and did in fact make withdrawals and deposits into this account, Debtor effectively controlled her daughter's share of the account. Ocker has alleged that money from this account was used to purchase Debtor's home and to pay attorney's fees and credit card debts. Debtor's testimony confirmed that she used some funds from her daughter's account towards the down payment on the Property, where both Debtor and her minor daughter resided. Debtor also testified that the account was repaid when the home was refinanced. The fact that Debtor also used, and then repaid, money from her daughter's account for living expenses, including attorney fees incurred in trying to keep her daughter's home, is immaterial to the Court's analysis under the Bankruptcy Code. The question under § 727(a)(4)(A) is whether the Debtor intentionally concealed these funds.

The Debtor testified she did not realize that she needed to include this account on her schedules or on her Statement of Financial Affairs because the money originated from a personal injury suit, and she considered the money to be her daughter's, and not her own. A discharge cannot be denied when items are omitted from the schedules by honest mistake, or where the omission is not material. *In re Arbaney,* 345 B.R. 293, 309 (Bankr. D. Colo. 2006); *In re Splawn*, 376 B.R. 747, 760 (Bankr. D.N.M. 2007). The Court finds the Debtor's testimony credible in establishing this omission as an inadvertent mistake, rather than an attempt to defraud the Court. Further, because Colo. Rev. Stat. 13-54-102(1)(n) exempts proceeds from a personal injury settlement from collection as part of the bankruptcy estate, the omission is not material. Because of this exemption, the administration of the chapter 7 estate is unaffected by Sara's unintentional exclusion of the account from her schedules. The Court dismisses this objection.

       3. § 727(a)(3) Objection.

Under § 727(a)(3), Ocker objects to the discharge because he claims that Debtor has concealed or failed to keep or preserve any recorded information from which Debtor's financial condition may be ascertained. This claim was not advanced by Ocker during trial or in closing argument, most likely because there was adequate information from which to determine Debtor's financial condition produced during discovery and at trial. Thus, the Court dismisses this objection.

B. Objections to Discharge Under 11 U.S.C. § 523.

Ocker has brought two dischargeability objections against Debtor under 11 U.S.C. § 523(a)(4) and § 523(a)(2)(A). The objections concern the purchase and refinance of the Property, and whether Debtor either breached a fiduciary duty to Ocker or defrauded him in connection with those transactions.

1. § 523(a)(4) Objection

Under § 523(a)(4), Ocker claims that Debtor's conduct constituted fraud or defalcation while acting in a fiduciary capacity. For this claim to succeed, he must prove by a preponderance of the evidence that (1) a fiduciary relationship existed between Ocker and Debtor, and (2) fraud or defalcation was committed by Debtor in the course of that fiduciary relationship. *In re Seay*, 215 B.R. at 785-86.

The existence of a fiduciary relationship is determined by federal law, but state law is relevant to determining whether a trust relationship exists. *Id.* at 786. Under federal law, the money or property on which the debt at issue was based must be entrusted to the debtor as a prerequisite to finding a fiduciary relationship. Thus, either an express or technical trust must be present; a general duty of confidence, trust, loyalty, or good faith, or an inequality between the parties' knowledge or bargaining power, is not sufficient to establish a fiduciary relationship. *Id.* In *In re Steele*, 292 B.R. 422, 427 (Bankr. D. Colo. 2003), the Court defined an express or technical trust under Colorado law:

> Express trusts are those trust relationships which are intentionally entered into by the parties. An express trust may involve a formal declaration of trust or a situation where the intention of the parties to form a trust relationship may be inferred by the surrounding facts and circumstances. A technical trust is distinguished from an express trust in that the intention of the parties is not relevant. In a technical trust, the trust obligations are imposed on the parties.

*Id.* at 427.

In certain instances, courts have found that a state statute imposes a technical trust upon the parties. *See, e.g., Allen v. Romero (In re Romero)*, 535 F.2d 618 (10th Cir. 1976). In the present case, however, Ocker has not relied on any state statutes to show that a technical trust exists between the parties. Rather, he relies on the relationship between the two parties as a basis for the existence of an express trust. A romantic relationship, however, does not establish an express trust. *See In re Hughes*, 354 B.R. 820 (Bankr. S.D.Tex. 2006). *Hughes* presented facts very similar to the ones presented here: the debtor's former domestic partner deposited proceeds of her personal injury action in the debtor's bank account in contemplation of their using funds to acquire a joint residence. When the relationship soured, the former partner alleged breach of a fiduciary duty under § 523(a)(4). The court denied the claim, holding the parties " had no formal or informal written or oral understanding . . . they were creating a trust . .

.that would impose on debtor the duties of a trustee, including the duty of providing an accounting upon termination of the trust." *Id.* at 823.

Colorado state law controls the requirements for this Court to find whether an express trust can be created. In *In re Granberry's Estate*, 498 P.2d 960 (1972), the Colorado Court of Appeals held that to prove that an express trust has been created, the following six elements must be present on the record:

1. the settlor's capacity to create a trust;
2. his intention to create a trust;
3. a declaration of trust or a present disposition of the res;
4. an identifiable trust res;
5. a trustee;
6. identifiable beneficiaries.

*Id*. at 963.

Here, there was never anything in writing between the two parties that evidenced the existence of an express trust. The only relevant writing is the letter stating Ocker was "giving" funds to Debtor, rather than transferring or entrusting them. The only other evidence that any trust existed between the parties is their own, competing oral testimony. Even if the Court finds the first two elements present, there is no evidence suggesting that under element three, a declaration of trust or a present disposition of the res was ever made. Thus, the Court cannot find an express trust.

Since Ocker has failed to prove that any fiduciary duty existed between the parties, it is not necessary to discuss whether the Debtor's conduct constituted fraud or defalcation for the purposes of this objection, and the § 523(a)(4) claim fails. *See In re Seay*, 215 B.R. at 787.

2. § 523(a)(2)(A) Objection

Under § 523(a)(2)(A), Ocker objects to Debtor's dischargeability on the basis that Debtor obtained money and services from Ocker under false pretenses, false representations, or actual fraud.

False pretenses or false representations are established by satisfying five elements:

1. the debtor made a false representation;
2. the debtor made the representation with the intent to deceive the creditor;
3. the creditor relied on the representation;

    4.     the creditor's reliance was reasonable;[3]
    5.     the debtor's representation caused the creditor to sustain a loss.

*In re Vickery*, 488 B.R. 680, 687 (10th Cir. BAP 2013) (citing *In re Young*, 91 F.3d 1367, 1373 (10th Cir. 1996)).[4]

Ocker alleges that Debtor made two false representations: one at the time the Property was purchased, and the other at that time of the refinance. Ocker claims that the parties agreed to buy the Property together, while Debtor claims that this was never the case. The only corresponding evidence for Ocker's claim is the testimony of Ann Taddeo.[5] Ann Taddeo, a friend and neighbor of Ocker, testified to a discussion between the parties she overheard several years ago that at closing Debtor verbally agreed to put Ocker on the title. Debtor, on the other hand, testified in her direct examination and under cross examination that she never expressed an intention to share ownership of the Property with Ocker. This testimony is corroborated by the documents in evidence that show only Debtor's name on the title and loan application in connection with the initial sale of the Property. Ocker testified that, because Debtor would get a better interest rate if the loan were in her name only, they agreed that she would purchase the house, with Debtor promising to put him on the title documents at a later time. However, a representation as to a future event generally cannot support a claim under § 523(a)(2)(A). *See In re Carlson*, 2008 WL 8677441, *3 (10th Cir. 2008) ("In order for a representation regarding future performance to be actionable under § 523(a)(2)(A), a debtor must lack an intent to perform when the promise was made."); *Hall v. Jackson (In re Jackson)*, 348 B.R. 595, 599 (Bankr. M. D. Ga. 2006) ("The failure to perform a mere promise is not sufficient to make a debt nondischargeable [under § 523(a)(2)(A) ], even [if] there is no excuse for the subsequent

---

[3] The "reasonable" requirement has been interpreted for § 523(a)(2)(A) claims as only requiring "justifiable reliance," a lower standard than reasonable reliance. *In re Daviscourt*, 353 B.R. 674, 684 (B.A.P. 10th Cir. 2006) (citing *Field v. Mans*, 516 U.S. 59, 71 (1995)).

[4] In *Vickery*, the Bankruptcy Appellate Panel of the Tenth Circuit established that actual fraud under § 523(a)(2)(A) "is not limited to representations and misleading omissions," and that "[w]hen a debtor intentionally engages in a scheme to deprive or cheat another of property or a legal right, that debtor has engaged in actual fraud and is not entitled to the fresh start provided by the Bankruptcy Code." The parties disagree as to whether they ever agreed to place Ocker on the title to the Property. Without an agreement in place, there is not enough evidence to support the idea that the Debtor intentionally engaged in a scheme to defraud Ocker of his $70,500. "Fraud" in a dischargeability claim means fraud in fact, involving moral turpitude or intentional wrong. *In re Van de Water*, 180 B.R. 283, 288 (Bankr. D. N.M. 1995). The evidence here simply does not support a finding of actual fraud under § 523(a)(2)(A).

[5] Ocker's mother also testified at trial that at one point Debtor told her she planned to put Ocker on the title "when she had a day off." However, Debtor testified that she never agreed to put Ocker on the title. In any event, the statement was related to a future event and as such would not support a claim under § 523(a)(2)(A).

breach.") (quoting 4 Collier on Bankruptcy ¶ 523.08[ 1][d] (15th ed. rev.2006)). Thus, Ocker has not shown that Debtor made a false representation at the time the Property was purchased.

Ocker also alleges that Debtor made a false representation in connection with the refinance of the Property. Ocker argues that in the letter written by Debtor and signed by Ocker dated February 26, 2009, the language that says "our loan" and "our house" means that the transaction was intended to reflect joint ownership of the Property. However, the letter did not obligate Ocker on any loan[6] and he admitted at trial that he never made a mortgage payment. The letter states that Ocker was "giving" (not loaning and not investing) funds to Debtor. Debtor testified that this letter was requested by the mortgage company in order to get the mortgage loan for the refinance. Exhibit 15 shows the source of the funds for the financing was "Gift Funds Chking/Savings," also evidencing that the transfer from Ocker was a gift. Additionally, Debtor testified that Ocker agreed to transfer money to her for the refinance in order to reduce their monthly expenses, so that she could "pay for everything." This was supported by her bank statements showing she paid for living expenses for both parties while they resided in the Property.

The Tenth Circuit dealt with a similar situation in *Taylor v. Rupp (In re Taylor)*, 133 F.3d 1336, 1342 (10th Cir. 1998). There, the Court held that "[an] intention to continue to live . . . on the premises and to pay a portion of the bills incurred during that occupancy does not establish proof of his intention to retain an ownership interest in property." The Tenth Circuit also noted the presumption that "when a husband pays (or here, signs over his interest) for property that is placed in his wife's name, he intends a gift," and that "the fact that he paid real estate taxes, insurance and utility bills could certainly be seen as his contributing to the expenses in return for living in the home which she owned." *Id.* Here, as in *Taylor*, the evidence Ocker offers shows that he made a gift to Debtor so that they could lower their expenses and he could continue to live on the Property with Debtor paying most of those expenses.[7] The evidence does not prove an ownership interest in the Property.

Ocker also claims that the work he did to improve the Property supports his claim of ownership. Whether he actually did work may be questionable given that he testified he is unable to do physical work and receives disability payments as a result. But assuming he did work on the Property, such work does not support an ownership interest in the Property. The testimony

---

[6] At trial, Ocker made much of the fact that one of the loan documents executed in connection with the refinancing had a box checked indicating that title was to be held jointly. However, the document only listed Debtor's name next to the box where it stated "title to be held in what name." Thus the box appears to have been checked in error. It is undisputed that Ocker's name never appeared on the loan or title documents.

[7] About a year after moving into the house, at Debtor's request, Ocker began paying Debtor $500 a month towards their expenses. This is more consistent with a rental agreement than with a co-ownership of property.

was clear that many individuals did work to improve the Property, and none of them expected to receive an ownership interest in the Property as a result. Ocker even testified that he would have been willing to help out with maintenance on the Property for his girlfriend even if he was not claiming an ownership interest. In any event, Ocker was unable to show that Debtor made any representation that the work he did on the Property would entitle him to an ownership interest.

Even if the Court could find that Debtor represented to Ocker that he would have an ownership interest in the Property, the Court cannot find that any such representation was done with an intent to deceive Ocker. Testimony from Debtor's family members as well as Ocker himself established that all parties believed the relationship was going well until the point that the parties separated. Debtor purchased the Property, and Ocker transferred funds to Debtor to refinance the Property, before any problems arose between the parties. The Court cannot make the inference that Debtor was scheming to defraud Ocker while in the midst of a happy relationship. Ocker has failed to produce any sort of written evidence or testimony to substantiate his claim that the relationship was all a ploy.

While Ocker did testify that he would not have transferred $70,500 if he did not rely on a representation that he was going to be a part owner of the house, the Court finds any reliance to be unjustified. The Colorado Statute of Frauds requires all transactions concerning real property to be in writing. Colo. Rev. Stat. 38-10-108. The Court cannot find that Ocker justifiably relied on any oral promise by the Debtor to share a real property interest when there is law in place to prevent exactly this type of situation. Therefore, the third and fourth elements required to be proven under § 523(a)(2)(A) are not met. Finally, regarding the last element, Ocker did not show that he suffered damages. Debtor testified that the monthly expenses, in the time that Ocker lived with her, exceeded the amount of the gift from Ocker, and Ocker did not rebut that testimony. Because none of the elements of § 523(a)(2)(A) have been proven, the Court will deny Ocker's claim under that section of the Bankruptcy Code.

C. Request for Equitable Determination under § 541(d).

Ocker alleged a claim under §541(d) in his complaint, but made no specific reference to that claim at trial or in closing argument. "Under § 541(d), 'property of the estate' includes property in which the debtor holds, as of the commencement of the case, only legal title and not an equitable interest, ... [but] only to the extent of the debtor's legal title to such property [and] not to the extent of any equitable interest that the debtor does not hold. On its face, § 541(d) thus excludes from the estate property that the debtor holds in constructive trust for another." *In re Ebel*, 144 B.R. 510, 515 (D. Colo. 1992). Ocker argued, at trial and in closing argument, that a constructive or resulting trust should be imposed. However, a creditor cannot simply claim entitlement to a constructive trust. *In re Lucas*, 300 B.R. 526, 533 (10th Cir. BAP 2003) (citing *Butner v. United States*, 440 U.S. 48 (1979)). Bankruptcy courts must look to state law to determine whether to impose a constructive trust. *Id., see also In re Musgrave,*, 2011 WL 312883, *15 (10th Cir. BAP 2011). Under Colorado law, to warrant the imposition of a constructive trust upon the property of a debtor, a claimant must (1) show fraud or mistake in the

debtor's acquisition of the property; and (2) be able to trace the wrongfully obtained funds to the property. *Id.* (citing *Hill v. Kinzler*, 275 F.3d 924, 926 (10th Cir. 2001).

In *Cross Country Land Svcs., Inc. v. PB Telecom., Inc.,* 276 Fed. Appx. 825 (10th Cir. 2008), the Tenth Circuit stated:

> The Colorado Supreme Court has provided two opinions that are instructive in defining the contours of constructive trusts: *In re Marriage of Allen*, 724 P.2d 651 (Colo.1986), and *Page v. Clark*, 197 Colo. 306, 592 P.2d 792 (1979). The Colorado Supreme Court in *Allen* stated that a "constructive trust is an equitable device used to compel one who unfairly holds a property interest to convey that interest to another to whom it justly belongs." 724 P.2d at 656-57 (citations omitted). In *Page v. Clark*, the Colorado Supreme Court stated that "[w]hen property has been acquired in such circumstances that the holder of legal title may not in good conscience retain the beneficial interest equity converts him into a trustee." 592 P.2d at 798 (quoting *Beatty v. Guggenheim Exploration Co.*, 225 N.Y. 380, 122 N.E. 378, 380 (1919)).

*Id*. at 835-36.

Additionally, in *Shepler v. Whalen*, 119 P.3d 1084, 1089 (Colo. 2005), the Colorado Supreme Court clarified the scope of constructive trusts when it construed them as "fraud-rectifying trusts" that are imposed in cases of fraudulent transfers, breach of contractual or fiduciary obligation, fraud, or other wrongdoing.

Here, Ocker has not met his burden to show that the refinancing of the Property was tainted by fraud, breach of contractual or fiduciary obligation, or other wrongdoing. Further, there is no clear statutory basis for applying constructive trusts in bankruptcy. *In re Cox*, 247 B.R. 556, 571 (Bankr. D. Mass. 2000). In fact, some courts have held that constructive trusts pit competing goals of the Bankruptcy Code against one another, and for this reason, should be applied circumspectly. *Id.* Under the Code, similarly situated creditors should be treated similarly, and property of the estate is construed broadly to expand the estate for the benefit of all creditors. *See In re LaFlamme*, 14 B.R. 21, 22 (1st Cir. BAP 1981). A constructive trust imposed on estate assets removes those assets from the general pool available to the creditor body, thereby favoring the trust beneficiary over other creditors. Thus, many courts have opted to strictly construe constructive trusts, where they have been allowed at all. *See Torres v. Eastlick (In re North Am. Coin & Currency, Ltd.)*, 767 F.2d 1573, 1575 (9th Cir.1985) (finding no fraud and observing that "we cannot accept the proposition that the bankruptcy estate is automatically deprived of any funds that state law might find subject to a constructive trust"); *In re Omegas Group, Inc.*, 16 F.3d 1443, 1451 (6th Cir. 1994) (refusing to impose constructive trust in the absence of a pre-petition state court decree that a constructive trust exists); *First Sec. Bank of Utah, N.A. v. Gillman*, 158 B.R. 498, 507 (D.Utah 1993) (refusing to impose constructive trust in absence of clear showing of unjust enrichment).

In this case, there was no state court judgment entered against Debtor. While there apparently was a state court action pending alleging a common-law marriage between the parties, no party requested relief from stay from this bankruptcy case to pursue that action. The Court questions whether it has jurisdiction to impose a constructive trust in the context of this case. The United States Supreme Court has held that bankruptcy courts lack the constitutional authority to enter a final judgment on a state law counterclaim that is not resolved in the process of ruling on a creditor's proof of claim. *Stern v. Marshall*, 131 S.Ct. 2594 (2011). Ocker has never filed a proof of claim in this bankruptcy case. Further, "bankruptcy courts in general which have been confronted with domestic relations matters have tended to have those matters resolved in the state court." *In re Fisher*, 67 B.R. 666 (Bankr. D.Colo.1986). Specifically, Ocker's common-law marriage claims are based solely on Colorado state law and would not be addressed in the process of estate administration. Here, the Trustee has not come forward to administer the Property for the benefit of creditors; thus, the imposition of a constructive trust would not advance the estate's administration. The Court declines to impose such a serious, broad-ranging remedy as a constructive trust solely on the evidence presented here.

Finally, Ocker has not shown that he is entitled to a resulting trust. A resulting trust does not arise unless the person transferring property (in this case, the transfer made in connection with the refinancing) manifests an intention that the transferee should not have the beneficial interest in the property. *In re Taylor*, 133 F.3d at 1341 (citing Restatement (Second) of Trusts § 442 (1959)). There is no evidence that Ocker did not intend Debtor to benefit from the transfer at the time it was made. A resulting trust is simply inapplicable.

For all the foregoing reasons, the Court concludes that Ocker's claims against Debtor are DENIED.

Dated this 3rd day of January, 2014.

**BY THE COURT:**

_Howard Tallman_
_____
Howard R. Tallman, Chief Judge
United States Bankruptcy Court